# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| Matthew W. Lance | : |
|  | : |
|  | : |
| Plaintiff, | : |
|  | : |
|  | :   CIVIL ACTION NO: 2:22-cv-2840-WB |
| v. | : |
|  | : |
| Southeastern Pennsylvania Transportation | : |
| Authority, | : |
| Defendant. | : |
|  | : |

---

## DEFENDANT SEPTA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

**PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP**

Dated: June 15, 2023

By: */s/ Angela L. Velez*
Gaetan J. Alfano, Esquire (32971)
Angela L. Velez, Esquire (330160)
1818 Market Street, Suite 3402
Philadelphia, PA 19103
*gja@pietragallo.com*
*alv@pietragallo.com*
(215) 320-6017 (Telephone)
(215) 754-5173 (Telecopy)

*Attorneys for Defendant*
*Southeastern Pennsylvania*
*Transportation Authority*

I.      **Preliminary Statement**

Plaintiff Matthew Lance ("Lance") and Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") executed a Settlement Agreement on November 4, 2021 (the "Agreement"). The Settlement Agreement agreed in part that SEPTA would (1) adopt a whistleblower anti-retaliation policy; and (2) remove entries on Lance's "white card" that reference discipline on October 31, 2013, October 13, 2015, and February 11, 2016. SEPTA has fully complied with the Agreement.  Lance's disagreement is not with whether SEPTA removed discipline from his file, because it did do so. Instead, Lance disagrees with the way in which SEPTA did so, after he made demands for multiple revisions and relief that exceeded the terms of the Settlement Agreement. Plaintiff also undeniably received a copy of SEPTA's whistleblower anti-retaliation policy and was advised the terms of the Agreement had been completed prior to July 1, 2022. Because Lance cannot point to any record facts to support his contention that SEPTA breached the Agreement, SEPTA is entitled to summary judgment.

II.     **Procedural and Factual History[1]**

On November 4, 2021, SEPTA and Plaintiff executed a Settlement Agreement resolving a complaint filed with OSHA. (SOF 3). The Settlement Agreement was subsequently approved by the Office of Administrative Law Judges. (SOF 4). The Settlement Agreement provided for SEPTA to pay a settlement amount to Lance, remove certain disciplines from Plaintiff's record or "white card," and adopt a whistleblower anti-retaliation policy by July 1, 2022. (SOF 5, 32; JA 119-124). SEPTA issued payment on Plaintiff's settlement amount of $60,000 within 8 days on November 16, 2021. (SOF 6-7). In an effort not to delay this payment, Christopher C. Cooper, Esquire, Special Counsel in SEPTA's Office of General Counsel recommended setting up a

---

[1] The Procedural and Factual History are summarized and combined herein as they are intertwined.

separate time to handle the removal of Plaintiff's discipline from his white card. (SOF 6-7). Plaintiff acknowledged this plan, replying "Sounds good, thank you." (SOF 8).

By way of further explanation, records of Plaintiff's discipline are recorded on a hard-copy physical "white card" that is stored at his work location, which is remote from the Office of General Counsel. (SOF 9). With respect to the status of Lance's "white card," Paragraph 2 of the Settlement Agreement states in its entirety:

> SEPTA agrees to remove from Lance's white card and personnel file all references to an documents related to discipline assessed against Lance on October 31, 2013, October 13, 2015, and February 11, 2016.   The removal of these references and documents to discipline will be witnessed by Lance and his Union Business agent at a time and place of SEPTA's convenience within thirty (30) calendar days following dismissal of the NTSSA Action.   Copies of such documents will (i) provided to Lance and (ii) placed in a confidential file maintain by SEPTA's General Counsel.   They will not be used by SEPTA in connection with any hiring, promotion, or transfer decisions.

(JA 120, ¶ 2).

On December 14, 2021, Cooper updated Lance that he was waiting for the receipt of Plaintiff's physical file and would then set up a time for him to come in for the removal of the discipline pursuant to the Settlement Agreement within the next week. (SOF 10). Although he previously acquiesced to this plan, Lance's reply was to state that "SEPTA has breached the settlement agreement," to forward to Cooper information regarding an unrelated worker's compensation claim, and to assert that he would be seeking a remedy with the Administrative Law Judge. (SOF 11). Nevertheless, Lance also stated, "If you sincerely believe we can work together to make this right let me know." (SOF 11). Because Lance was represented by an attorney on his worker's compensation claim, Cooper was unable to speak to Lance about that matter.  (SOF 13). But as to Lance's white card, Cooper told him, "I will let you know when I have your file in my

possession. If you want to come in and watch the discipline being removed we can arrange a time."
(SOF 13).

One day later, on December 15, 2021, Cooper received a copy of Lance's file from the
work location. (SOF 14). Cooper emailed Lance that day to schedule a time to meet, and the two
agreed to December 21, 2021. (SOF 15-16). Cooper, Lance, and Lance's Union Representative
met on December 21, 2021. (SOF 17) On that date, Cooper redacted the disciplines from the white
card by fully blacking out the three lines of the white card reflecting disciplines for October 31,
2013, October 13, 2015, and February 11, 2016. (SOF 17; JA 89 (redacted white card)). As Lance
did not agree that a redaction complied with the settlement agreement (SOF 18), Cooper proposed
that he obtain a new white card, rewrite the prior disciplines not subject to removal under the
Settlement Agreement, and have the Union and Lance sign off on them. (SOF 19).

Because Lance did not wish to sign off on prior disciplines he did not agree with (but which
were not covered by the Settlement Agreement), Cooper proposed a new method: he would re-
write the disciplines, minus those to be removed per the Settlement Agreement, and then write, "I
acknowledge that the disciplines above are accurate copies of my discipline from my prior white
card. My signature does not mean I agree with the above disciplines." (SOF 22-25). Cooper
proposed that the Union and Lance would then sign the white card below that statement. (SOF 22).
Lance also disagreed with this plan and instead proposed issuing a new blank white card, which
have required removing all discipline, including those not covered by the Settlement Agreement.
(SOF 26). Cooper replied to Lance that "[t]he agreement is specific to which disciplines get
removed," and that "My proposal makes clear that your signature is just acknowledging that it is
a correct copy of your old white card (minus the 3 removed entries from the settlement agreement)
and does not mean you agree with the prior disciplines." (SOF 27).

As Lance would still not agree to this plan (SOF 29), on February 8, 2022, Cooper notified Lance that he would be issuing a new white card removing the three white card entries agreed to in the Settlement Agreement, and that Lance could memorialize his disagreement and it could be included in his file. (SOF 30). Cooper completed a new white card for Lance, re-writing the prior discipline not subject to the Settlement Agreement and writing the statement: "The prior disciplines above this line were rewritten by Chris Cooper in OGC on 2-8-22 pursuant to a settlement agreement.  The original is on file in the OPC should labor relations need it in the future." (SOF 31). Cooper signed the February 8, 2022 white card. (SOF 31). Upon a request by Lance to remove the written statement on the white card, Cooper explained to Lance that, "the original discipline files were always going to be kept in the General Counsel's office. Without a note in the file then labor relations would not know this, should it be pertinent in the future." (SOF 32).

As to the whistleblower anti-retaliation policy, Paragraph 1 of the Settlement Agreement states:

> SEPTA agrees to adopt a Whistleblower anti-retaliation program guided by OSHA's Recommended Practices for Anti-Retaliation Programs published on January 13, 2017.  The parties recognize that the OSHA best practices are advisory in nature and that they may be adjusted to fit SEPTA's specific needs.  Specifically, SEPTA will develop a program and policy for Whistleblower Anti-Retaliation to be implemented and fully effective on or before July 1, 2022 and will inform Lance of the same.  Such program and policy will:
> a. Ensure that employees are not punished or otherwise subjected to an adverse employment action for reporting in good faith safety related concerns or incidents or for engaging in similar activity; and
> b. Provide employees with information and resources about exercising whistleblower rights; and
> c. Conspicuously post the OSHA Fact Sheet Whistleblower Protection for Public Transportation Agency Workers in all reporting locations where employee notices are posted (this notice explains that the

5

NTSSA covers employees of public transportation agencies and its contractors or subcontractors; defines protected activity under the act; defines retaliation; and explains how to file a complaint with OSHA); the 2-page OSHA Fact Sheet will be printed in the size and format of other employee postings and with both pages of the Fact Sheet inseparable and simultaneously viewable;

d. SEPTA's Whistleblower Anti-Retaliation policy will provide a defined reporting point (expected to be the Equal Employment Opportunity ("EEO") Department, the Office of the Inspector General ("OIG") Department, or the Systems Safety Department) for employees to report suspected violations of this policy, which reports will be promptly and thoroughly investigated within 90 calendar days. SEPTA agrees that, at the time an employee reports a suspected violation of the Anti-Retaliation policy, SEPTA will provide the employee with written notice of the employee's rights, including the right to be free from retaliation for making a good faith report and the right to file a complaint with OSHA under the National Transit Systems Security Act within 180 days from the date of the alleged adverse action.; and

e. Maintain employee confidentiality to the extent practicable; and

f. Include training and information on whistleblower protections; specifically, the NTSSA, into new hire orientation, SEPTA's annual employee Safety Day meeting and events, and manager training.

(JA 119-120, ¶ 1).

Beginning in May 2022, Lance requested updates on the adoption of the whistleblower anti-retaliation program. (SOF 34). Cooper replied to these requests, updating Lance on the adoption of the program, including Paragraphs 1a-f. (SOF 35). On June 22, 2022, Cooper emailed Lance to inform him that the Revised Policy A10 (the Whistleblower Anti-Retaliation policy) was posted to SEPTA's intranet. (SOF 38). On June 24, 2022, Cooper informed Lance that as to Paragraphs 1a-f, "they're completed." (SOF 41). And as Lance told Cooper he was having trouble accessing the intranet, Cooper sent Lance a copy of the A10 Policy on June 29, 2022. (SOF 42-44). Lance acknowledged receipt. (SOF 45).

On July 18, 2022, Lance filed a Complaint in the Eastern District of Pennsylvania against SEPTA and Gino J. Benedetti, Billy J. Smith, and Cooper, all employees of SEPTA, seeking judicial enforcement of the settlement agreement as to removal of his discipline and seeking damages. (ECF No. 1) On October 26, 2022, SEPTA filed an Answer and moved for dismissal of the Individual Defendants. (ECF Nos. 11, 12).

On December 19, 2022 Plaintiff filed an Amended Complaint, removing the Individual Defendants and his claim for any damages beyond court costs and filing fees. (ECF No. 18). Plaintiff also asserted that "SEPTA failed to '…develop a program and policy for Whistleblower Anti-Retaliation to be implemented and fully effective on or before July 1, 2022." (ECF No. 18, ¶ III.B). SEPTA filed an Answer on January 3, 2023, denying Plaintiff's claims and asserting affirmative defenses. (ECF No. 21).

## III.    Legal Standard

"Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). To defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. An issue is genuine if

the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson*, 477 U.S. at 248.

## IV.    Legal Argument

Lance alleges that SEPTA breached the Settlement Agreement. Specifically, he claims that SEPTA failed to "develop a program and policy for Whistleblower Anti-Retaliation to be implemented and fully effective on or before July 1, 2022…" and failed to "remove from Lance's white card and personal file all references to and documents related to discipline assessed against Lance on October 31, 2013, October 13, 2015, and February 11, 2016." SEPTA disagrees.

A settlement agreement is a contract governed by "basic contract principles." *In re Diet Drugs Product Liability Litigation*, 706 F.3d 217, 223 (3rd Cir. 2013) (citing *In re Cendant Corp Litig.*, 233 F.2d 188, 193 (3d Cir. 2000)).  Additionally, the terms of the Settlement Agreement explicitly provide, "[t]he agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.  The remedies available to either party shall be the remedies of breach of contract and it is agreed no duties relating to the terms and covenants of this Agreement will be imposed upon either party beyond the terms and covenants of this Agreement." (JA 123 ¶ 11).

For a plaintiff to successfully maintain a cause of action for breach of contract, the plaintiff must prove: "(1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) damages resulting from a breach of that duty."*Lomma v. Ohio National Life Assurance Corp.*, 283 F. Supp. 3d 240, 249 (M.D. Pa. 2017); *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1125 (Pa. Super. Ct. 2004) (*citing CoreStates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). SEPTA does not dispute the existence of the Agreement and Plaintiff does not claim any damages beyond court

costs. Thus, the only issues are whether SEPTA has breached a duty imposed by the contract. SEPTA has complied with the terms of the Settlement Agreement: it has removed any references to disciplines for the dates specified in the Settlement Agreement from Lance's white card and adopted a whistleblower anti-retaliation policy.

Contract interpretation is a question of law.  *See Toll Naval Associates v. Chun-Fang Hsu*, 85 A.3d 521, 530 (Pa. Super. Ct. 2014).  "Under Pennsylvania law, a court interpreting a contract must first determine as a matter of law whether the contract language is ambiguous or clear." *Polish American Machinery Corp. v. R.D. & D. Corp.*, 760 F.2d 507, 512 (3d Cir. 1985) (citations omitted).  "In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language."  *Pennsbury Village Associates, LLC v. Aaron McIntrye*, 608 Pa. 309, 322, 11 A.3d 906, 914 (Pa. 2011). "Only where the writing is ambiguous may the factfinder examine the relevant extrinsic evidence to determine the parties' mutual intent." *Allstate Transp. Co., Inc. v. Southeastern Pennsylvania Transp. Auth.*, 2000 WL 329015 (E.D. Pa. Mar. 27, 2000) (*citing Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 613 (3rd Cir. 1995); *see also Am. Eagle Outfitters v. Lyle & Scott, Ltd.*, 584 F.3d 575, 587 (3rd Cir. 2009). Additionally, for purposes of construction, the Settlement Agreement states it "has been negotiated jointly and there shall be no presumption of construction against any party… and not strictly for or against any party."  (JA 11).

The record illustrates that SEPTA complied with the clear, unambiguous terms of the Settlement Agreement and is entitled to judgment as a matter of law.

## A. SEPTA Removed the Specified Discipline from Plaintiff's White Card.

First, the language in Paragraph 2 of the Settlement Agreement is clear and uses unambiguous terms to establish SEPTA's duty thereunder, which was to remove the disciplines

for three dates from Lance's white card and personnel file. (JA 120). As the language of Section 2 of the Settlement Agreement is unambiguous, interpretation of this provision is a solely legal question within this Court's purview. *Polish American Machinery Corp.*, 760 F.2d at 512.

SEPTA first met its obligations on December 21, 2021, when Cooper met with Lance and his Union representative by appointment and redacted or fully blacked out the disciplines for October 31, 2013, October 13, 2015 and February 11, 2016, from Lance's white card. (SOF 17; JA 89 (redacted white card)). Lance's disagreement with this plan, and his back-and-forth exchange objecting to several alternatives proposed by SEPTA, ultimately led to SEPTA issuing an alternate version of the white card on February 8, 2022. (SOF 18-30). That February 8, 2022 white card (JA 88), where Cooper re-wrote the existing disciplines, minus three disciplines to be removed, also complied with the Settlement Agreement. (SOF 30; JA 88).

Lance's discovery responses make clear that his concern is not that SEPTA failed to remove the three disciplines from this white card, it is that SEPTA "added reference to the removed discipline on the personal file." (JA 137). But the February 8, 2022 white card merely states, "The prior disciplines above this line were rewritten by Chris Cooper in OGC on 2-8-22 pursuant to a settlement agreement. The original is on file in the OPC should labor relations need it in the future." (JA 88). This statement does not in fact refer to other discipline removed pursuant to the Agreement, it refers to the disciplines that are written above the statement. Indeed, it directly relates to another provision of the paragraph that "Copies of all such documents will be…placed in a confidential file maintained by SEPTA's Counsel." (JA 119, ¶ 2).

Lance is also ignoring the reality of the questions that would ensue if any person other than Lance or Cooper were to view the February 8, 2022 white card, with disciplines rewritten in the same handwriting and lacking the names and initials of the original scribes. (*Compare* JA 114

10

(original white card, with highlights) to JA 88 (February 8, 2022 white card). As Cooper explained to Lance, "the original discipline files were always going to be kept in the General Counsel's office. Without a note in the file then labor relations would not know this, should it be pertinent in the future." (SOF 32; JA 20). Indeed, looking at the Settlement Agreement as a whole, it both reflects that copies of the original white card will be "placed in a confidential file maintained by SEPTA's General Counsel," and that "[t]hey will not be used by SEPTA in connection with any hiring, promotion, or transfer decisions." (JA 120). This provision shows that Cooper's statement that "[t]he original is on file in the OPC should labor relations need it in the future," was merely a record of the legal action taken with regard to Lance's white card, and not intended to show or imply that any other disciplines existed or should be considered for an improper purpose.

The record as a whole shows that there is no genuine dispute as to any material facts, which consist of (1) what the Settlement Agreement states, and (2) what was written on the proposed white cards. The facts – coupled with the clear and unambiguous text of the Settlement Agreement – evidence that SEPTA's efforts (particularly the February 8, 2022 proposed white card) were fully compliant with the plain text of the Settlement Agreement. More than once, SEPTA properly removed all references to disciplines that were required to be removed and added no additional references to such disciplines. Plaintiff's demand for additional relief beyond the express terms of the Agreement, and general obstructiveness, was the cause of any delay in the implementation of this provision of the Agreement. Accordingly, SEPTA is entitled to judgment as a matter of law with respect Lance's claim under Paragraph 2 of the Settlement Agreement.

**B. SEPTA Adopted a Whistleblower Anti-Retaliation Program and Policy**

Lance is unable to meet his burden of proving that SEPTA failed to "adopt a Whistleblower anti-retaliation program guided by OSHA's Recommended Practices for Anti-Retaliation

Programs published on January 13, 2017." Lance is incorrect that SEPTA failed to timely implement such a policy. The requirements set forth in Section 1 of the Settlement Agreement contains clear and unambiguous language, which therefore bypasses any need for a fact finder with respect to the issue. *See Toll Naval Associates*, 85 A.3d at 530.

SEPTA instituted a whistleblower anti-retaliation policy by the date that it was required to do so under the Settlement Agreement.  The policy, number A10, states that its effective date is July 1, 2022 and that it was approved on June 17, 2022.  (JA 96, 101).  In a June 22, 2022 email from Chris Cooper to Lance, Mr. Cooper indicated that the revised A10 policy was posted on the intranet (SOF 41), which shows that such policy was drafted and prepared prior to the required time under the Settlement Agreement.  Mr. Cooper also sent a copy of the A10 policy to Lance via email on June 29, 2022 – two days prior to the date it was required to be effective. (JA 93-102). Lance's response thereto indicated that he had received the A10 Policy. (SOF 45).  These facts are not disputed, and they show that, in contrast to Lance's Amended Complaint, that SEPTA developed a program and policy for Whistleblower Anti-Retaliation on or before July 1, 2022.

Cooper further confirmed to Lance that Paragraphs 1a-f had been implemented. (SOF 37, 41). Not only was the policy properly instituted by July 1, 2022, as required by the Settlement Agreement, but substantively the policy implemented other provisions of the Agreement.  Section III subsection (B) of the A10 Policy provides:

> SEPTA does not tolerate or condone acts of retaliation or intimidation toward a person who, in good faith, files a complaint of discrimination or harassment or testifies, assists or participates in any investigation into allegations of discrimination or harassment. Retaliation includes, without limitation, imposing any form of adverse or negative terms or conditions of employment upon an employee because he or she complained of harassment or discrimination or assisted another employee in complaining. Engaging in any activities found to be retaliatory, pursuant to this policy, will result in disciplinary action, up to an including

12

> discharge.  Disciplinary action for acts of retaliation or intimidation can and will be taken even if the initial allegations of discrimination are not substantiated.

(JA 119 ¶ 1a; JA 99).  This language provided in the A10 policy implements Paragraph 1(a) of the Settlement Agreement, which requires a policy that employees shall not be punished for good faith reporting of such concerns.

With respect to Paragraph 1(b) regarding SEPTA informing employees about their whistleblower rights, this is encompassed in Section IV(A) of the A10 policy, titled Employee Rights and Responsibilities.  (JA 99).  Section IV(A) states, in its entirety:

> An employee who believes they were treated in a discriminatory manner, harassed based on protected class membership or retaliated against in violation of this policy, or has observed said behavior; must immediately report the actions or conduct giving rise to such belief to their immediate supervisor, next level of management, system safety hotline (if the issue is safety related) or the EEO/AA&ER Department. An employee also has the right to file a complaint with the Equal Employment Opportunity Commission (EEOC).

> An employee also has the right to report any purported retaliation to SEPTA's Office of Inspector General (OIG). Allegations of retaliation will be investigated by the OIG, or its delegate (Office of General Counsel or Equal Employment Opportunity Department). OIG, or its delegate, will seek to complete all investigations under this paragraph within ninety (90) days. However, some circumstances will necessitate an extension of time to complete the investigation. The employee may also choose to report purported retaliation to OSHA directly.

(JA 99).  In addition, as Cooper informed Lance, the A10 Policy is posted on the company's intranet, and thereby available to SEPTA employees. (SOF 38).  This same Section of the A10 policy also provides a "reporting point" for employees to report suspected violations of the policy, as set forth under 1(d) of the Settlement Agreement.  (JA 120, ¶ 1d; JA 99).  Chris Cooper's email to Lance further supports this position: in response to an inquiry by Lance as to whether retaliation

complaints are handled by the Office of the Inspector General, Cooper responded, "Yes, OIG will handle any complaints." (SOF 51).

As it relates to 1(c) of the Settlement Agreement, Cooper's July 5, 2022 email also makes clear that the OIG will distribute fact sheets to the posting areas, as specified under the Settlement Agreement. (JA 119; SOF 51). As for the requirements imposed by 1(f) of the Settlement Agreement, Cooper communicated to System Safety that training and information on whistleblower protections must be included in manager training, new hire orientation and Safety Day. (SOF 53)

Lance's discovery responses make clear that his concern is not with whether SEPTA implemented *a* whistleblower anti-retaliation policy by July 1, 2022, but that it is not the policy he believes they should have adopted. He asserts in his response to SEPTA's Interrogatories, that SEPTA's "minor changes" "fall far short of implementing the substantial programming and policy recommendations of OSHA's recommendations." (JA 137). But adopting a policy approved by Lance is not required by the Settlement Agreement. According to the express terms of the Settlement Agreement, the parties "recognized that the OSHA best practices are advisory in nature and that they may be adjusted to fit SEPTA's specific needs." (JA 119). As such, the parties expressed an understanding that the end result of SEPTA's whistleblower anti-retaliation policy would not be identical to that contained within OSHA's recommendations.

Lance also contends that he "acquired evidence that SEPTA's Whistleblower Anti-Retaliation policy was still being actively developed and revised after July 1, 2022." (JA 137). Regardless of the truth of Plaintiff's allegation, this contention is not a material fact. The ongoing revision or development of any policy at SEPTA is irrelevant to whether SEPTA met its obligations to adopt a whistleblower anti-retaliation policy prior to July 1, 2022. The Agreement

does not reserve an ongoing right for Lance to insert himself into the development of policy at SEPTA following the expiration of that period. (JA 119-120). Once the A10 Policy was adopted, SEPTA's obligations to Plaintiff on this point ended.

In sum, Lance cannot point to anything that suggests there is a dispute as to any of the material facts, which are the terms of the Settlement Agreement setting forth the whistleblower anti-retaliation program, and SEPTA's adoption of the policy and program as communicated to Lance. Because the terms of the Settlement Agreement are clear, and the undisputed material facts show that SEPTA adopted the whistleblower anti-retaliation policy by July 1, 2022, Lance fails to meet his burden to show that SEPTA breached its Settlement Agreement with respect to instituting the whistleblower anti-retaliation policy. Therefore, SEPTA is entitled to judgment as a matter of law on this issue.

**V. Conclusion**

As SEPTA removed the specified disciplines from Lance's white card and adopted a whistleblower anti-retaliation policy by July 1, 2022, Lance cannot show that SEPTA breached the Settlement Agreement. As such, summary judgment should be entered in favor of SEPTA and Lance's Amended Complaint should be dismissed.

> Respectfully submitted,
>
> **PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP**

Dated: June 15, 2023                    By:/s/ Angela L. Velez
                                        Gaetan J. Alfano, Esquire (32971)
                                        Angela L. Velez, Esquire (330160)
                                        1818 Market Street, Suite 3402
                                        Philadelphia, PA 19103
                                        gja@pietragallo.com
                                        alv@pietragallo.com

(215) 320-6017 (Telephone)
(215) 754-5173 (Telecopy)

*Attorneys for Defendant*
*Southeastern Pennsylvania*
*Transportation Authority*

8262531